IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAMIN J. JAFARI, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| vs. | )   Civil No.   12-1276-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| | ) |
|        Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Ramin J. Jafari is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423. For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Ramin Jafari applied for benefits in August 2009 alleging disability due to complications from a stroke, high blood pressure, and high cholesterol (Tr. 166). After holding an evidentiary hearing, Administrative Law Judge Stuart T. Janney denied the application for benefits in a decision dated May 11, 2011 (Tr. 20–31). Jafari's request for review was denied by the Appeals Council, and ALJ's Janney's decision became the final agency decision (Tr. 1). Jafari has exhausted his administrative remedies and has filed a

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 15).

Case 3:12-cv-01276-CJP Document 31 Filed 07/03/14 Page 2 of 16 Page ID #1150

timely complaint in this court seeking judicial review of the ALJ's adverse decision.

## ISSUES RAISED BY PLAINTIFF

In his brief (Doc. 21), Jafari raises the following issues:

1. The ALJ erred in evaluating the credibility of Jafari's testimony regarding the intensity, persistence, and limiting effects of his headaches, his hand impairment, and his visual impairment;

2. The ALJ failed to consider the combined impact of Jafari's impairments and to explain how the evidence supported the RFC assessment;

3. The ALJ improperly evaluated the opinion of the treating specialist.

## APPLICABLE LEGAL STANDARDS

### A.     Disability Standard

The Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the ALJ determines that the claimant is disabled or not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520(a)(4).

The first step considers whether the claimant is presently unemployed. 20 C.F.R. § 404.1520(a)(4)(i). If the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step. *Id.* The second step evaluates whether the claimant has an impairment or combination of impairments that is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). Again, if the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step. *Id.* The third step analyzes whether the claimant's severe impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling. 20 C.F.R. §


404.1520(a)(4)(iii). If the answer is "yes," the claimant is automatically deemed disabled; if the answer is "no," the inquiry proceeds to the next step. *Id.*

Before continuing to the fourth step, the claimant's residual functional capacity ("RFC") is assessed. 20 C.F.R. § 404.1520(a)(4). The fourth step then assesses whether the claimant can perform past relevant work given his or her RFC. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is "yes," the claimant is not disabled and the inquiry is over; if the answer is "no," the inquiry proceeds to the next step. The fifth and final step assesses whether the claimant can perform other work given his or her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is "yes," the claimant is not disabled and the claim is denied. *Id.* On the other hand, if the answer is "no," the claimant is deemed disabled. *Id.*

**B.      Judicial Review**

The scope of judicial review of the Commissioner's decision is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, the Court must determine not whether Ewing was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence.")

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence,

resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  In addition to supporting the decision with substantial evidence, the ALJ must also include an adequate discussion of the issues and "build an accurate and logical bridge" from the evidence to each conclusion.  *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008).

While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (listing cases).   "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.")

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by Jafari in his complaint.

**A.**   **Plaintiff's Background**

Ramin Jafari was born in November 1982, and was 25 years old on the alleged onset date—July 1, 2008 (Tr. 162).  He was insured for DIB through September 30, 2013 (Tr. 162).

He is 5 feet, 7 inches tall and weighs approximately 190 pounds.  He lives in Chester, Illinois with his wife and his child, who was 11 months old at the time of the evidentiary hearing.  He has a high school education.

Jafari enlisted in the Army and entered basic training in August 2004. Approximately 3 weeks into basic training, he woke up one day with severe pain in both shoulders and he could hardly move his arms. His shoulder pain did not abate, and Jafari received an uncharacterized discharge from the Army in October 2004. The Army concluded that his shoulder pain was service connected and he was entitled to 30% disability for rotator cuff tendonitis of the left shoulder and 20% disability for rotator cuff tendonitis of the right shoulder (Tr. 138–45).

Following his discharge from the Army and prior to the alleged disability onset date, Jafari worked as a stock clerk at Target, a hospital cleaner, an armored car driver, and a convenience store clerk. He quit working on July 1, 2008 due to his impairments (Tr. 166).

B.  **Jafari's Disability Allegations and Agency Forms**

Ramin Jafari submitted a number of forms to the Social Security Administration, including three disability reports, a work history report, two function reports, and a list of medications (Tr. 165–79, 182–90, 195–202, 212–19, 224–28, 241–43). Jafari also testified at an evidentiary hearing in from of ALJ Janney on May 11, 2011 (Tr. 39–74). His wife, Leslie, submitted a Third Party Function Report (Tr. 203–10). At the time she submitted it, she had known Jafari for two years and spent every day with him. Mrs. Jafari largely corroborated her husband's statements on his disability application. The following is a summary of Jafari's allegations regarding his disability as presented on the agency forms and at the evidentiary hearing.

On his disability application, Jafari alleged that he was disabled due to complications from a stroke, high blood pressure, and high cholesterol (Tr. 166). Specifically, Jafari suffers from pain in both shoulders; pain and weakness in both arms;

numbness in both hands; neck pain; and headaches.

As previously indicated, Jafari's shoulder pain began in 2004 during basic training. The pain and weakness in his arms and the numbness and tingling in his hands began a short time later. The neck pain began "at least a few years" prior to the administrative hearing. Sometimes Jafari's neck starts to hurt suddenly for no reason. At the time of the hearing, Jafari was taking oxycodone for the pain in his shoulders and neck. It did not completely eliminate his pain, but sometimes it made his pain more manageable. He was not taking any medication for the arm weakness at the time of the hearing; he had previously tried nerve pain medication, but it did not help.

As for his headaches, they began prior to the alleged disability onset date. His headaches have progressively gotten more severe and frequent, and they interfere with his activity more often and for longer periods of time. During a typical week, he has headaches on a daily basis. They most commonly last for about half a day, but some only last for a couple hours, and others last for more than one day. Loud noise & physical activity make his headaches worse. He has tried triptan therapy, specifically Imitrex, to relieve his headaches, but it did not help. He has also tried preventative medication, like Topamax, but it did not help. He has not tried injections. Typically, he has to lie down to get relief. Sometimes he is in bed all day due to his headache.

At the hearing, Jafari testified to a number of other symptoms that he is now suffering. He has had weakness in his right leg since a spinal tap in November 2010. As a result, he has difficulty walking a couple times a week. He also has short term memory problems. For example, if he needs to go to the grocery store for two or three items, he must make a list or he will forget what items he needs by the time he gets to the store. Additionally, he needs help organizing his medications and reminders from his wife to take

them. He is also experiencing trouble with fine motor coordination. For example, it is difficult for him to fasten buttons and snaps, and his wife cuts his food for him because he has problems holding the fork and using the knife at the same time.

According to Jafari, he is only awake 10 to 12 hours a day. To pass the time when he is awake, he watches television, listens to the radio, and he helps take care of the baby by changing her diaper, making her bottle, and feeding her. He has a laptop computer which he usually uses on a daily basis to check his email and Facebook. Jafari also does light chores around the house. For example, he lets the dogs out and fills their food and water dishes, but his wife bathes, grooms, and walks them. He can wash dishes for 5 or 10 minutes, but then he starts dropping dishes. If he's having a good day, he can do laundry, but not a lot of the folding. He used to cook all the time, but now he only heats frozen food. He no longer does repairs around the house. His wife usually does the yard work; sometimes he will cut the grass, but the last time he did, it caused severe neck pain. Sometimes he has trouble taking a shower because it is painful to lift his arms to clean himself or dry himself off. His wife has to cut his hair.

Jafari leaves his house a few times a week, sometimes daily. He can still drive, but no longer does so at night because his night vision is worsening. He goes to medical appointments on a regular basis. About once or twice a month, usually before or after a medical appointment, he and his wife go out to eat. He also goes to the store with his wife about twice a month. At the store, he picks the groceries out and his wife gets them off the shelf. His social activities have decreased because when he is in pain he is crabby and unable to enjoy company and conversations. He occasionally goes to a friend's house where they sit around talking and watching television.

Jafari estimated that he can stand for about 10 minutes to 30 minutes, depending

on the day. He cannot tolerate sitting on hard surfaces for long, and he can tolerate sitting in a chair for about an hour. At the time of the hearing, he did not lift anything heavier than his daughter; she weighed 25 pounds and he could only hold her for 5 or 10 minutes. The ALJ asked Jafari if he could handle a low stress desk job where he had little interaction with other people. Jafari answer "no," he did not think he could work every day due to of his headaches because he doesn't know what causes them, and once he has one, he has a hard time functioning.

**C.    Medical Records**

There are approximately 700 pages of medical records in the transcript, primarily covering the period of time between the alleged onset date in July 2008 and April 2011.

Around the time of the alleged onset date in July 2008, Jafari complained to his primary physician at the VA about chronic shoulder pain, worsening pain in his right arm, and numbness and tingling in his right hand (Tr. 531–32; *see also* Tr. 524–29). The next month, he reported that the pain had not improved and he was referred to a pain management specialist, Dr. Richard George (Tr. 507–09, 524–29). Jafari was also referred to the eye clinic because he was having difficulty with his vision (Tr. 524–29). During the eye examination, the optometrist detected a left homonymous hemianopia affecting a 15 degree range (Tr. 440, 522–23).[2] A subsequent CT scan and MRI of his head came back abnormal and revealed ischemic or post-infarct changes along the internal and external cortex in his right and left occipital, parietal, and frontal lobes (*See, e.g.,* Tr. 499, 914) In other words, Jafari had suffered a "large" stroke that caused his visual defect (Tr.

---

[2] A homonymous hemianopia is a visual defect or blindness affecting the right halves or the left halves of the visual fields in both eyes. DORLAND'S MEDICAL DICTIONARY 835 (32nd ed. 2012) (defining "homonymous hemianopia" and "hemianopia"). Jafari has a left homonymous hemianopia, meaning he has lost the left half of his visual field in both eyes.

643).

Jafari was sent to a neurologist at the VA, Dr. Sadasivam Modali, whom he saw for the first time in September 2008 (Tr. 498–504). At that time, Jafari's chief neurological complaints were frequent headaches, intermittent tingling and numbness in his fingers on his right hand, and frequent neck pain (Tr. 499). Dr. Modali began a workup in an attempt to determine the etiology of Jafari's stroke and his pain (*See* Tr. 501).

The workup stretched on for the next two and a half years. During that time, Jafari made numerous visits to a progression of doctors. Jafari saw his primary care physician and a pain management specialist at the VA on approximately 15 occasions each. Jafari also saw Dr, Modali on more than one occasion, as well as, a cardiologist and a vascular surgeon. He was referred to a local civilian neurologist, Dr. Fahkre Alam, whom he saw eight times. He saw a psychologist more than five times for evaluation and treatment of his anxiety and depression. He saw a dermatologist on numerous occasions for a rash on his hands and scalp. He was also referred to a neurologist at an academic center— Dr. Steven Brenner at St. Louis University—whom he saw on at least six occasions and spoke with on the telephone a number of other times. While under the care of Dr. Brenner, Jafari also saw a civilian neurosurgeon and a civilian vascular neurologist.

Jafari also underwent extensive testing. He had a number of MRIs of his head and cervical spine, and an MRI of his lumbar spine. He underwent a carotid ultrasound, an echocardiogram, a transesophageal echocardiogram, and a cardiac stress test. He also underwent a magnetic resonance venogram of his brain, an electroencephalogram, and nerve conduction studies of both arms. He had innumerable laboratory tests, a lupus screening, genetic testing, and a hemoglobin electrophoresis test. He also underwent a cerebral angiogram and a spinal tap.

Finally, Jafari has taken a mind-boggling number of medications. He was prescribed medications for high blood pressure and high cholesterol, including amlodipine besylate, aspirin, hydrochlorothiazide, and Simvastatin. He took various oral medications and used a number of topical medications for his dermatological problems. He tried more than one medication to help him sleep, including Benadryl and Ambien. He took medication for his depression and anxiety. Finally, he unsuccessfully tried a significant number of medications to control his pain and migraines. In particular, he tried various nonsteroidal anti-inflammatory drugs (NSAID), including diclofenac, salsalate, and etodolac; various muscle relaxers, including Flexeril, baclofen, and methocarbamol; Gabapentin, hydrocodone, Inderal, Imitrex, Lyrica, Depakote, carbamazepine, Topiramate, amitriptyline, tramadol, Percocet, and Firocet. At the time of the hearing, he was taking 14 different medications (Tr. 241).

Despite the extensive testing, no physician has been able to definitively diagnose the etiology of Jafari's cerebral infarct or the cause of his pain and headaches. Several things have been ruled out, including blockage in his carotid artery, Lupus, CADASIL syndrome, and herniation of his cerebellar tonsils (*See* Tr. 440, 814, 815, 867–68, 891–92, 913–17). Dr. Richard Callison, the civilian vascular neurology specialist, performed a spinal tap in November 2010 and cerebral angiogram in January 2011 (Tr. 914, 956–61). In February 2011, based on the results of the spinal tap which showed elevated protein, Dr. Callison opined that Jafari might be suffering from indolent central nervous system vasculitis (Tr. 948). He recommended neuropsychological testing to evaluate Jafari's memory and executive function (Tr. 948). At the time of the administrative hearing, Jafari had not undergone that testing, but was scheduled to do so.

Over the course of time, Jafari's condition has continued to deteriorate. In the six

months prior to the administrative hearing, Jafari still had daily headaches, chronic pain in both shoulders, radiating pain in both arms, and numbness in both hands (Tr. 930–32, 973). He reported his neck pain was getting even worse (Tr. 871, 973, 1026). Jafari further reported fatigue, increased weakness in his hands, the loss of fine motor coordination in his hands, shooting pain in his right leg, unsteadiness and difficulty walking, and memory loss (Tr. 814–17, 1026).

**D.    Consultative Examination**

Frank Kosmicki, a licensed clinical psychologist, conducted a psychological examination of Jafari in November 2009 at the request of the State of Illinois in connection with his application for benefits (Tr. 617–20). Prior to the clinical interview, Dr. Kosmicki reviewed Jafari's Disability Report (SSA-3368) and a mental health progress note from July 2009. Dr. Kosmicki then spent 30 minutes with Jafari, and his psychometrist spent another 30 minutes with Jafari. Dr. Kosmicki diagnosed Jafari with an undifferentiated somatization disorder and adjustment disorder with mixed anxiety and depressed mood.

There was no physical consultative examination.

**E.    State Agency RFC Assessments**

In October 2009, a state-agency physician assessed Jafari's physical RFC based upon a review of the medical records (Tr. 635–42). The physician opined that Jafari had no exertional or manipulative limitations, but should never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to noise and hazards. The physician also opined that Jafari had a visual limitation.

In May 2010, a second state-agency physician re-assessed Jafari's physical RFC based upon a review of the medical records (Tr. 802–09). The only difference between this

assessment and the previous assessment was the physician opined that Jafari was exertionally limited to light work.

In December 2009, a state agency psychologist completed a Psychiatric Review Technique form (Tr. 621–33). The psychologist concluded there was insufficient evidence to substantiate the presence of an affective disorder, anxiety disorder, or a somatoform disorder. In May 2010, Donald Henson, Ph.D., completed a second Psychiatric Review Technique form (Tr. 788–801). Dr. Henson determined that Jafari had an anxiety disorder that did not precisely satisfy the criteria of Listing 12.06, and an RFC assessment was necessary. Dr. Henson also opined that Jafari was moderately restricted in activities of daily living, had mild difficulty in maintaining social function, and had mild difficulty in maintaining concentration, persistence, or pace (Tr. 798). In his mental RFC assessment, Dr. Henson opined that Jafari had only one limitation—he was moderately limited in his ability to carry out detailed instructions (Tr. 810–12).

**F.     Vocational Expert's Testimony**

Following Jafari's testimony at the evidentiary hearing on April 26, 2011, a vocational expert (VE) testified. The ALJ asked the VE a series of hypothetical questions. The VE was asked to assume a person of Jafari's age, education, and work experience who was able to do work at the light exertional level, with the following limitations:

- No climbing ladders, ropes, or scaffolds;
- No concentrated exposure to hazards such as unprotected heights or moving machinery;
- No overhead reaching with either arm, but can frequently reach in all other directions, and frequently handle, perform fine finger manipulation, and feel with both arms;
- Must work in an environment with no more than moderate noise and no light brighter than fluorescent lighting; and
- Cannot set goals or formulate strategies for dealing with complex or highly detailed tasks.

(Tr. 68–69). The VE testified that this hypothetical person could not perform any of his past jobs, but there are other unskilled occupations that the person could perform, such as labeler or marker, order caller, or office helper.

The VE was then asked to assume the same hypothetical person except that the person was limited to sedentary work (Tr. 70). The VE testified that this hypothetical person could work as an order clerk, information clerk, or office helper (Tr. 70–71). However, the hypothetical person would be precluded from all work if he was consistently absent from work two or three time per month (Tr. 71).

## **THE DECISION OF THE ALJ**

ALJ Janney denied Jafari's claim on May 11, 2011 in a written decision (Tr. 20–31). The ALJ followed the five-step analytical framework outlined in 20 C.F.R. § 404.1520. At step one, the ALJ determined that Jafari had not engaged in substantial gainful activity since the alleged onset date of July 1, 2008 (Tr. 22). The ALJ also found that Jafari is insured for DIB through September 30, 2013 (Tr. 22). At step two, the ALJ found that Jafari had a number of severe impairments, including: visual field loss, astigmatism, accommodative spasms, and left homonymous hemianopia; rotator cuff tendonitis and bilateral supraspinatus tear; bilateral carotid stenosis; post cerebral vascular accident/progressive neurological disease; carpal tunnel syndrome/disturbance of sensation of the hands; headaches; cervical spine degenerative disc disease with radiculopathy; cerebellar tonsillar herniation/ectopia; adjustment disorder; and anxiety disorder (Tr. 22). The ALJ also found that Jafari had several non-severe impairments, including seborrheic dermatitis, hypertension, and an acute herniated disc. The ALJ rejected Sherk's claim of a severe impairment of somatization disorder. At step three, the ALJ determined that Jafari did not have an impairment or combination of impairments

that met or medically equaled a listed impairment (Tr. 23).

At step four, the ALJ concluded that Jafari had the residual functional capacity to perform work at the light exertional level, with additional limitations (Tr. 25). The ALJ then concluded at step five, based on the testimony of a vocational expert, that Jafari could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economy (Tr. 30). As a result, Jafari was not disabled.

## ANALYSIS

The record in this matter is quite extensive; in fact, it is over 1,000 pages, 700 of which are medical records. However, the Court did not have to look very far or hard into those 1,000 plus pages before finding a blatant error in the ALJ's decision that, without a doubt, requires remand. Specifically, the ALJ erred in evaluating the opinion of treating neurologist Steven Brenner, M.D. about Jafari's probable absenteeism from work. This issue is critical because the VE testified that Jafari would be precluded from all work if he was consistently absent two or more times per month (Tr. 71).[3]

In March 2010, Dr. Brenner completed a Medical Source Statement in which he estimated that Jafari was likely to be absent from work an average of four days per month as a result of his impairments or treatment (Tr. 652–659). The opinion of a treating physician generally is entitled to controlling weight if it is supported by medical findings and not inconsistent with other substantial evidence in the record. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)). If the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ

---

[3] It is not clear from the transcript of the evidentiary hearing if the VE's opinion regarding absenteeism applied to unskilled work at both the sedentary level and the light level, or whether it applied only to work at the sedentary level (*See* Tr. 71). In his brief, Jafari assumed the VE meant both the sedentary and light work (*See* Doc. 21, p. 20), and the Commissioner made no argument to the contrary (*See* Doc. 29, pp. 13–15).

must provide a sound explanation for declining to do so.  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection."); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010) ("An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer "good reasons" for declining to do so.")

The ALJ stated, in a conclusory manner, that Dr. Brenner's deserved "little weight as it is inconsistent with the objective evidence" (Tr. 29).  That was the extent of his explanation.  The ALJ did not specify what evidence he was talking about, or articulate how Dr. Brenner's opinion was inconsistent with that evidence.  Simply put, the ALJ's determination that Dr. Brenner's opinion deserves little weight is "suspended over air" rather than supported by a logical bridge as required by law.  *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011).

Furthermore, it appears to the Court that Dr. Brenner's opinion is very consistent with the objective evidence.  The record illustrates that Jafari had frequent medical appointments.  By the Court's own count, during the 34 months between the alleged disability onset date in July 2008 and the end of the medical records in April 2011, there were at least 85 days on which Jafari had doctor visits, lab specimens collected, and/or diagnostic tests performed.  Translated into absences from work, Jafari would likely miss an average of 2.5 days a month for medical appointments alone.  It stands to reason that Jafari would also have additional absences on days when his symptoms were particularly bad.  *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days . . . .")  Therefore, according to the VE's testimony, Jafari would be precluded from all work due to his absenteeism.

In sum, the ALJ did not provide a satisfactory explanation for discounting Dr. Brenner's opinion regarding Jafari's potential rate of absenteeism.  The Court concludes that this matter must be remanded for reconsideration of whether Dr. Brenner's opinion deserves controlling weight, and if not, what weight it does deserve.

Because the Court has determined that remand is necessary, it need not explore Jafari's remaining arguments.  On remand, the residual functional capacity assessment and credibility determination should also receive a fresh look.  *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Jafari is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Ramin Jafari's application for social security disability benefits and supplemental security income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of Plaintiff Ramin Jafari

**IT IS SO ORDERED.**

**DATE:**   July 3, 2014

                                           s/ Clifford J. Proud
                                           **CLIFFORD J. PROUD**
                                           **UNITED STATES MAGISTRATE JUDGE**